UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

CHRISTINE DUTTWEILLER,

                          Plaintiff,

v.                                                          5:05-CV-0886
                                                            (GTS/GHL)

EAGLE JANITORIAL, INC., EAGLE
JANITORIAL SERVICES, INC., EAGLE
BUILDING SERVICES, INC., and LOCAL
200 UNITED SERVICE EMPLOYEES
INTERNATIONAL UNION, AFL-CIO,

                          Defendants.
_____

APPEARANCES:                                    OF COUNSEL:

CARROLL LAW FIRM                                WOODRUFF LEE CARROLL, ESQ.
  Counsel for Plaintiffs
Galleries of Syracuse, 2nd Floor
441 South Salina Street
Syracuse , NY 13202-0352

PRIMO, PRIMO LAW FIRM                           TERRY J. KIRWAN, JR., ESQ.
  Counsel for Defendant Eagle Janitorial Inc.
7075 Manlius Center Road
East Syracuse , NY 13057

OFFICE OF MAIREAD E. CONNOR                     MAIREAD E. CONNOR, ESQ.
  Counsel for Defendant Local 200
  United Service Employees International
  Union, AFL-CIO
440 South Warren Street, Suite 703
Syracuse , NY 13202

HON. GLENN T. SUDDABY, United States District Judge

**<u>DECISION and ORDER</u>**

On July 15, 2005, Plaintiff Christine Duttweiler ("Plaintiff") filed this labor and disability discrimination action, pursuant to the Labor Management Relations Act of 1947, 29 U.S.C. § 141 *et seq*., the Americans with Disabilities Act, 42 U.S.C. § 12111 *et seq*., and the New York state human rights law, arising out of incidents leading up to and including Plaintiff's termination from employment with the Eagle Defendants.  On July 1, 2007, Plaintiff filed an Amended Complaint, voluntarily discontinuing her claims against Upstate Building Maintenance Companies, Inc., and Eagle Janitorial Services, Inc.  (Dkt. No. 60.)  As a result, currently remaining in this action are Plaintiff's claims against (1) Eagle Janitorial, Inc., (2) Eagle Building Services, Inc., and (3) Local 200 United Service Employees International Union, AFL-CIO.

On July 15, 2008, Defendant Union filed a motion for summary judgment.  (Dkt. No. 87.) On August 15, 2008, Defendant Eagle requested leave to join in the motion of Defendant Union. (Dkt. No. 92.)  That same day, Defendant Eagle's request was denied by Chief Judge Norman A. Mordue, who directed Defendant Eagle to file separate motion papers on behalf of Defendant Eagle.  (Dkt. No. 93.)  However, subsequently, Defendant Eagle did not file such motion papers. (*See* generally Docket Sheet.)  On September 2, 2008, Plaintiff opposed Defendant Union's motion, after being granted an extension of time by which to do so.  (Dkt. No. 94.)  On September 8, 2008, Defendant Union filed its reply.  (Dkt. No. 95.)  That same day, Defendant Union filed a motion to strike (1) portions of Plaintiff's response affidavit, (2) the "neuropsychological evaluation" submitted by Plaintiff, and (3) the entire depositions of Stark, Gravina, Dennis and Loftus, as well as the records of Dr. Bakay and Dr. Bhagavatula.  (Dkt. No. 96.)

1

After carefully considering the parties' motion papers, and for the reasons set forth below, Defendant Union's motion for summary judgment is granted; Plaintiff's claims against Defendant Union are dismissed in their entirety; Defendant Union's motion to strike is granted in part and denied in part; and Defendant Eagle is granted leave to promptly file a motion for summary judgment.

## I.   RELEVANT LEGAL STANDARD

For the sake of brevity, the Court will not repeat the well-known legal standard governing motions for summary judgment pursuant to Fed. R. Civ. P. 56.  Rather, the Court will refer the parties to its decision in *Proctor v. Kelly*, 05-CV-0692, 2008 WL 5243925, at *3-4 (N.D.N.Y. Dec. 16, 2008) (Suddaby, J.).  However, the Court will note that it is mindful of the fact that "[d]istrict courts must be cautious when granting summary judgment in employment discrimination cases because the employer's intent is often at issue."  *Stone v. Manhattan and Bronx Surface Transit Operating Auth.*, 539 F. Supp.2d 669, 676 (E.D.N.Y. 2008) (citation omitted).  "Because a victim of discrimination is seldom able to prove h[er] claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence, where there are issues going to a defendant's . . .  intent and state of mind, summary judgment is ordinarily inappropriate." *Manhattan and Bronx Surface Transit Operating Authority*, 539 F. Supp.2d at 676 (citation omitted).  "However, the summary judgment rule would be rendered sterile if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion."  *Id*. (citation omitted).  "Summary judgment is therefore still appropriate even in the fact-intensive context of discrimination cases where the standards of Rule 56 have been met."  *Id*. (citations and internal quotations omitted).

## II.      BACKGROUND

### A.      Plaintiff's Rule 7.1 Response and Defendant Union's Motion to Strike

Before proceeding to a recitation of the undisputed material facts on Defendant Union's motion, the Court must address certain issues raised by (1) Plaintiff's Rule 7.1 Response to Defendant Union's Rule 7.1 Statement of Material Facts, and (2) Defendant's motion to strike.

In its motion for summary judgment, Defendant Union filed a Rule 7.1 Statement of Material Facts, consisting of 125 paragraphs, and accurately cited to the admissible record evidence.  Subsequently, Plaintiff's counsel submitted a Rule 7.1 Response, admitting or denying the factual assertions in each of Defendant's paragraphs.  More specifically, Plaintiff's Rule 7.1 Response contained 64 denials of factual assertions in Defendant's Rule 7.1 Statement. For each of these 64 denials, Plaintiff provided a record citation to her affidavit submitted in opposition of Defendant's motion for summary judgment (hereinafter "the Duttweiler Affidavit").

There are four main defects in the Duttweiler Affidavit.[1]  First, approximately 47 of the paragraphs of the Duttweiler Affidavit contain arguments, in violation of Local Rule 7.1(a)(2). For example, on page 16, the Duttweiler Affidavit states as follows: "Denied by inference [that Plaintiff never told the Employer that she had any particular disability].  She never had a diagnosis to give the employer because they fired her in breach of the contract before a diagnosis was obtained as stated herein despite a mediation agreement that they would not."  Similarly, on page 17, the Duttweiler Affidavit states as follows:

---

[1]      An additional defect, not discussed in this Decision and Order in the interest of brevity, is that numerous paragraphs of the Duttweiler Affidavit contain assertions that are non-responsive and/or immaterial in nature.

Denied [that progressive discipline is often used in industrial labor relations to help an employee correct his or her behavior].  Progressive discipline is not relevant to discharge under the union contract unless and until the alleged violation rises to the level of for cause.

No amount of accumulated arbitrary and/or discriminatory or petty discipline rises to the level of for[-]cause firing.

As progressive discipline is not included under the contract[,] it may not be the basis for a for[-]cause firing.

The employer is ignoring other discipline methods than firing that might be allowed under the contract and are more effective.

As a result, those portions of the Duttweiler Affidavit containing arguments are stricken from the record.[2]

Second, approximately 46 of the paragraphs of the Duttweiler Affidavit contain statements that are expressed in the third person point of view, rather than in the first person point of view.  For example, on page 16, the Duttweiler Affidavit states as follows: "I am meticulous and conscientious and generally completed my work as assigned.  The Plaintiff denies the work plenty and states that there are only three reported incidents in which she did not finish my work and these were not my fault."  Similarly, on page 21, the Duttweiler Affidavit states as follows: "She was in the process of obtaining [a medical diagnosis] and this was known to the union."

Ordinarily, this sort of grammatical error might be academic.  However, when the error occurs in an affidavit–which attempts to serve as the sole record evidence opposing a motion for summary judgment–the error becomes highly material.  Specifically, by being narrated in the

---

[2]      A district court may, in its discretion, strike "inappropriate portions of a summary judgment affidavit."  *Epstein v. Kemper Ins. Co.*, 210 F. Supp.2d 308, 313 (citation omitted).

third-person perspective or voice (and not the first-person perspective or voice), the Duttweiler
Affidavit clearly demonstrates that it was drafted by Plaintiff's counsel, not Plaintiff, and that it
was not even closely reviewed by Plaintiff so as to catch such obvious errors.

Plaintiff is reminded that Rule 56 of the Federal Rules of Civil Procedure states that "[a]
supporting or opposing affidavit must be made on personal knowledge, set out facts that would
be admissible in evidence, and show that the affiant is competent to testify on the matters
stated." Fed. R. Civ. P. 56(e)(1); *see, e.g., Vandeventer v. Wabash Nat. Corp.*, 867 F. Supp. 790,
798 (N.D. Ind. 1994) (affidavit written in voice of another witness insufficient to show personal
knowledge); *Texas Dept. of Pub. Safety v. Rodruguez*, 953 S.W.2d 362, 363-64 (Tex. App. 1997)
(affidavit narrated in third-person voice insufficient to show personal knowledge); *cf. Prod.
Liab. Ins. Agency v. Crum & Forester Ins. Co.*, 682 F.2d 660, 662 (7th Cir. 1982) ("Conclusional
denials . . . in affidavits obviously drafted by lawyers are entitled to little weight in deciding
whether to grant [a] . . . motion for summary judgment."). <u>As a result, those portions of the
Duttweiler Affidavit narrated in the third-person perspective or voice are stricken from the
record</u>.

Third, approximately 14 of the paragraphs of the Duttweiler Affidavit contain statements
that, regardless of whether or not they were written in the third-person, still are clearly not made
on Plaintiff's personal knowledge. For example, on page 19, the Duttweiler Affidavit denies
that the Employer received complaints about Plaintiff's work performance from LeMoyne
College audits, without indicating how she was in a position to know of the Employer's receipt
of those complaints at the time in question (regardless of whether or not the audits were later
destroyed). Similarly, on page 28, Plaintiff denies that the Union asked a certain question of the

Employer at a mediation, but acknowledges that she has no recollection of whether that question was or was not asked.  Again, statements in Plaintiff's affidavit not made on Plaintiff's personal knowledge are insufficient to oppose Defendant's motion for summary judgment.  <u>As a result, these portions of the Duttweiler Affidavit narrated in the first-person perspective or voice but not made on Plaintiff's personal knowledge must be also stricken from the record.</u>

Fourth, approximately 33 of the paragraphs of the Duttweiler Affidavit contain factual assertions that attempt to contradict, in part or in whole, sworn testimony previously given by Plaintiff during her deposition.  The Court says "attempt to contradict," because the vast majority of these factual assertions (1) are wholly immaterial to Defendant's factual assertions, (2) are only partially responsive to Defendant's factual assertions, and/or (3) in fact admit Defendant's factual assertions.  Among the few attempted contradictions that are actually material to Defendant's factual assertions are on page 26 of the Duttweiler Affidavit.  On that page, Plaintiff denies Defendant's factual assertion that "Plaintiff was not sure [during December 2004] who [harassed her by moving her things], and thought it may be college students, or was not sure which coworker, if any, may have [harassed her]."  Specifically, Plaintiff asserts, "Further reflection indicates that the students had left on break and therefore [it] must be a co worker."

"It is well-settled that a party may not defeat . . . a motion [for summary judgment] by submitting an affidavit that disputes [or contradicts] his prior sworn testimony."  *Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 572 (2d Cir. 1991) (citation omitted); *Langman Fabrics v. Graff Californiawear, Inc.*, 160 F.3d 106, 112 (2d Cir. 1998) (citation omitted).  The reason for this rule is that permitting a non-movant to oppose a motion

for summary judgment in this way would "diminish[] the utility of summary judgment as a procedure for screening out sham issues of fact." *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir.1969).  If Plaintiff wished to contradict her own deposition testimony, the permissible procedural method would have been to either (1) clarify her testimony on cross-examination by her own counsel, pursuant to Fed. R. Civ. P. 30(c)(1), or (2) within 30 days after the deposition transcript becomes available, sign a statement listing the changes to that transcript, and the reasons for making those changes, pursuant to Fed. R. Civ. P. 30(e)(1)(B).  <u>As a result, these portions of the Duttweiller Affidavit that attempt to contradict (or that do contradict) her previous deposition testimony are also stricken from the record</u>.

These four defects that plague the Duttweiler Affidavit essentially render the Affidavit without legal effect.  As explained above, the Court has determined, in its discretion, that the vast majority of the Duttweiler Affidavit should be stricken for the reasons just described.  *See Hollander v. American Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999), *abrogated on other grounds by Schnabel v. Abramson*, 232 F.3d 83 (2d Cir. 2000).  <u>The result of this determination is that only a few paragraphs of Plaintiff's Rule 7.1 Response (which are not fatally flawed due to any of the four above-mentioned defects) may be deemed to be (barely) sufficient to successfully controvert various assertions in Defendant's Rule 7.1 Statement.</u>  Those sufficient paragraphs are as follows: (1) Paragraph Number 1 (to the extent it seeks to controvert the implication that Plaintiff was terminated on January 18, 2005); (2) Paragraph Number 28; (3) Paragraph Number 42 (to the extent it seeks to controvert the implication that the Employer did not have "enough" management personnel to watch every employee on the Le Moyne campus during the time in question); (4) Paragraph Number 47 (to the extent it seeks to assert that Plaintiff does not know

7

of such a policy based on her personal knowledge); (5) Paragraph Number 52 (to the extent it seeks to assert that Plaintiff documented the criticisms but does not currently possess that documentation); and (6) Paragraph Number 83 (to the extent it seeks to imply that information given by Plaintiff to the Employer about "Debbie" could be, and was, imputed to the Union).

Finally, the Court is mindful of the technical errors that exist in the "neuropsychological evaluation" submitted by Plaintiff, as well as the depositions of Stark, Gravina, Dennis and Loftus and the records of Dr. Bakay and Dr. Bhagavatula.  The Court is also mindful that, generally, courts may not, when deciding a motion for summary judgment, consider evidence that would be inadmissible at trial.  *Rubens v. Mason*, 387 F.3d 183, 188 (2d Cir. 2004). However, despite the procedural errors, the Court should afford Plaintiff herself special solicitude, due to her status as a civil rights litigant.  Moreover, simply because a neuropsychological evaluation has not been authenticated does not mean that it could not be admitted at trial.  Similarly, simply because certain depositions or records do not comply with the technical requirements of the Federal Rules of Civil Procedure does not mean that they could not be admitted at trial.  For all of these reasons, the Court denies Defendant Union's motion to strike to the extent its seeks to strike the neuropsychological evaluation submitted by Plaintiff, and the depositions and medical records produced by Dr. Bakay and Dr. Bhagavatula.

**B.    Undisputed Material Facts**

Between May 14, 2000, and January 19, 2005, Plaintiff was an employee of Defendant Eagle Janitorial Services (hereinafter "Eagle" or "Employer").  In addition, between 1988 and 2000, Plaintiff was employed by Eagle's predecessors at LeMoyne College.  During that 1988 to 2005 time period, Plaintiff performed janitorial services at LeMoyne College.  Also during that

time, Plaintiff was a member of Defendant Local 200 United Service Employees International Union (hereinafter "Union").[3]

From at least 2003 until the end of her employment with Eagle, Plaintiff's Union representative was Robert Loftus.  While Plaintiff worked for Eagle, her immediate supervisor was Steve Gravina, whose supervisor was Duncan Stark, Vice President of the Employer.

In June 2003, Loftus met with Plaintiff concerning some problems she said she was having at work.  Sometime after the meeting, Loftus spoke with the Employer in order to alleviate some of the communication problems that Plaintiff faced.  Loftus asked the Employer to write out a list of Plaintiff's job duties.  As a result, Gravina wrote out a list of Plaintiff's job duties in June 2003.

In that same month, Plaintiff received her first discipline from the Employer, in the form of a verbal warning, for failure to comply with the written instructions.  Specifically, the instructions indicated that Plaintiff was not to enter certain occupied suites prior to 9:30 a.m. because male athletes who occupied those suites were to leave at that time.  However, Plaintiff informed her supervisor that she attempted to enter the suites "to start cleaning" them before 9:30 a.m.

Loftus filed a grievance for Plaintiff based on this discipline, which resulted in mediation pursuant to the procedures in the CBA in March or April 2004.  In the interim, sometime in the Fall of 2003, Plaintiff contacted Loftus to report to him accusations made by the Employer

---

[3]      On August 1, 2003, the Employer and the Union entered into a collective bargaining agreement ("CBA") that governed the terms and conditions of employment of Eagle's employees at LeMoyne College, including Plaintiff, between August 1, 2003, and July 31, 2007.

against her.  These accusations included statements by supervisors Stark and Gravina that

Plaintiff was not doing her work, as well as other statements that were critical of Plaintiff's

work.  In response, Loftus told Plaintiff to document the events.  According to Plaintiff, because

she contacted Loftus every time the accusations occurred, she did not, in addition, always

document the accusations.

      In January 2004, Loftus met with Plaintiff to tell her that the Employer was intending to

discipline her for performance problems on the job.  Loftus suggested to Plaintiff that a job

coach come to Plaintiff's job to witness what the Employer was doing and help Plaintiff on the

job.  Plaintiff confided in Loftus that she suffered a brain injury when she was hit by a car as a

child and she did not know what the extent of that injury was or how it could be affecting her

job.  After their conversation, Loftus called the New York State Division of Human Rights

("Human Rights") to find out what they could suggest to try to help Plaintiff.  Human Rights

suggested that VESID, a New York State vocational rehabilitation agency, may be able to help

Plaintiff.  Loftus also suggested to Plaintiff that a "job coach" through VESID may help her, and

Plaintiff agreed that it would be a good idea.

      In March or April, 2004, Loftus, Stark, Gravina, and Plaintiff attended a mediation with

Mediator Tim Gorman concerning Plaintiff's job performance that was held as a result of the

Union filing Plaintiff's grievance.  During the mediation, the mediator also suggested that

Plaintiff would benefit from the VESID program and a job coach could be provided through that

agency.  Plaintiff agreed in the mediation that it would be important to have a job coach.  Loftus

and the mediator gave Plaintiff a booklet about VESID during the mediation.

      The Union presented the VESID program and a job coach to the Employer as a way in

which the Employer and Union could help Plaintiff so that the Employer would not have to

terminate her.  The Union obtained permission from the Employer to have a job coach assist

Plaintiff.  However, Loftus did not tell the Employer that Plaintiff had a brain injury because

Plaintiff had confided in him and asked him to keep that information confidential.

      According to Loftus, the Employer was concerned with Plaintiff's confusion in following

work orders.  According to Stark, Plaintiff had difficulty managing her time, "putting more focus

on things that were less of a priority than to areas that needed to be completed."

      On or about April 27, 2004, Loftus made an appointment for Plaintiff at VESID, told her

when it would take place, and accompanied her to the VESID office at the State Office

Building.  Plaintiff attended an orientation meeting with Loftus at VESID that day and received

an application for vocational rehabilitation services.  However, Plaintiff did not give the

application to the VESID employees that day because she did not fill out the questions that said,

"What is your disability?" and "Describe how your disability limits your ability to work."

VESID employees told Plaintiff that she needed to obtain a medical diagnosis and some

statement from her doctor to proceed with the VESID program.  Plaintiff then started looking

into whether she had a disability.

      On July 22, 2004, the Employer issued Plaintiff a first written "Employee Counseling

Notice" for failure to follow procedures and violation of company policies.  Gravina stated that

on July 21, 2004, Plaintiff called her supervisor's voice mail to say she had lost her access card

for the building and then remained in the building after her shift to look for it without her

supervisor's permission.  According to Gravina, Plaintiff had been told on numerous occasions

not to be in the buildings on campus after her scheduled shift end, that she was not to return to

buildings without permission, and that she must complete anything she needs to do before she was "off the clock."  However, according to Plaintiff, she had routinely obtained permission in the past to remain in the building after hours if she had a good reason.

That same day, Plaintiff contacted the Union and spoke with Loftus.  In that conversation, Loftus gave Plaintiff emotional support and was generally supportive of Plaintiff. As a result of that discipline, Plaintiff, Loftus, and the Employer attended mediation, pursuant to the procedures of the CBA.  After that mediation, Loftus asked Plaintiff about her progress toward the VESID program.  Plaintiff told Loftus that she could not get a statement of disability until she had the tests and she did not yet have a doctor who could test her.  Plaintiff did not tell Loftus that she was trying to be tested for ADD.  Instead, Plaintiff told Loftus that she had a "weakness where she got distracted easily."

Subsequently, Gravina and Stark were dissatisfied with Plaintiff's work, telling her on different occasions that her work was "terrible," the bathrooms "were really filthy," and "if anyone cleaned them right they shouldn't be that filthy," and she was not in the place she was supposed to be while working.  Plaintiff continued to call Loftus about these criticisms she was receiving from her supervisors.  However, Plaintiff did not document all of these verbal criticisms as Loftus had instructed her to do.

On August 31, 2004, the Employer issued Plaintiff a second written warning or "Employee Counseling Notice," for infractions that took place on August 26 and August 30, 2004.  That notice cited Plaintiff for poor work performance, failure to follow procedures, and violation of Company policies.  According to Stark, on August 26, 2004, Plaintiff called from the workplace to say that she forgot to put the trash cart in the janitor's closet as requested by her

supervisor, and that she had locked the closet and that she left her personal belongings in the building.  According to Plaintiff, after she spoke with Stark, he told her to leave the cart out. The notice also stated that on August 30, 2004, two minutes before her shift ended, Plaintiff called her supervisor (Gravina) to say that her watch was wrong and that she had not completed her duties.  Plaintiff admitted that the events described in the counseling notice were true in that she knew she was not supposed to go back into the buildings after her shift ended and that she did not clean two suites because her watch was wrong.

Plaintiff called the Union and spoke to Bob Loftus about the second written warning shortly after receiving it.  Loftus told Plaintiff to document the events; however, Plaintiff did not document these particular events.  Loftus also told Plaintiff that he was going to grieve the August discipline.

Loftus filed a grievance and requested mediation from the New York State Mediation Board on the September 1, 2004 discipline, pursuant to the procedures of the CBA.  As a result of the Union's request, Loftus, Stark, Gravina, and Plaintiff attended a mediation concerning the discipline conducted by Mediator Tim Gorman.  During the mediation, Plaintiff, the Union and the Employer agreed that Plaintiff would get some type of medical notification to the Employer concerning her medical condition, even if it was from a family physician.  In return, the Employer agreed that it would hold off disciplining Plaintiff for any other disciplinary matters. Nonetheless, Plaintiff never obtained a medical diagnosis or statement from a doctor that she was being tested or seeking professional help prior to being terminated in January 2005.

According to the Employer, between September 7, and October 7, 2004, there were numerous instances in which the Employer could have disciplined Plaintiff for poor work

performance or failure to follow policies or procedures, yet refrained from doing so because of the agreement it had with the Union that it would hold off disciplining Plaintiff if she produced proof that she was seeing a medical professional. Employer further asserts that Plaintiff called management numerous times unnecessarily, more times than any other employee, and did not follow instructions, which disrupted management's day, wasted their time, and caused her not to complete her work. Plaintiff does not deny that her work was criticized, or that she made the phone calls to management, but asserts that the calls were necessary and her work was satisfactory.

Plaintiff called Loftus at least weekly throughout the Fall of 2004 about problems she had on the job. During those phone calls, Loftus told Plaintiff that he was receiving calls from the Employer saying that her work was not acceptable, and asked Plaintiff about how her medical documentation for VESID was coming. Loftus told Plaintiff that the Employer was going to continue writing her up, which is why they needed to get a job coach for her. However, a job coach was not assigned from VESID because Plaintiff never produced the medical documentation VESID needed.

On November 15, 2004, the Employer issued Plaintiff a "third written, final notice Employee Counseling Notice," for infractions that occurred on November 11, 2004 related to poor work performance and failure to follow procedures. The third "final" written counseling notice states that Plaintiff "calls Eagle management for all sorts of minor unnecessary issues very frequently and on 11/11/04 she did not make a call for an equipment failure issue until an hour after she had left the job. On this day her vacuum cleaner was supposedly giving her problems and it slowed her down enough to where she couldn't finish her work in her allotted time. This

is yet another example of Christine being unable to, complete her work in a timely manner, make decisions as to when and when not to call management, and not reporting that she couldn't finish her work until it was too late to resolve the issue that day."  According to Plaintiff, she was placed in a situation where she was forced to use an inadequate vacuum to finish the job and then written up for it.  Plaintiff asserts that for months she had complained about the vacuum's ineffectiveness, but was not allowed to obtain another vacuum from another hall.

The Employer did not terminate or suspend Plaintiff for the November 11, 2004, infraction and instead implemented an additional step in the progressive disciplinary policy of an additional warning notice.  The Employer did this to give Plaintiff additional opportunity to obtain medical documentation because the Employer did not believe that suspending or terminating Plaintiff would be appropriate at that time.  To this end, the Employer also offered Plaintiff time off so she could go to a doctor and get the information back to them to avoid progressing toward discharge.

Plaintiff did not deal with the Employer after receiving the November discipline, but called Loftus because she thought he would be supportive of her.  Loftus grieved the write up and requested mediation again from the New York State Mediation Board, pursuant to the procedures of the CBA.  The mediation took place on December 17, 2004, and was attended by Plaintiff, Loftus, Stark and Gravina and Mediator Tim Gorman.  During the mediation, Gravina urged Plaintiff to get the documentation she needed of any medical condition for VESID.  The Employer, Union and Plaintiff agreed as a result of the mediation that Plaintiff would obtain medical documentation concerning any condition for VESID so that a job coach could be assigned, and the Employer again agreed to hold off disciplining Plaintiff.  Plaintiff testified that

15

Gravina and Stark informed her at the meeting that she was going to have one more chance to keep her job with the Employer.  Plaintiff also testified that she believed that going to a doctor and whether she had a disability was her "personal business."  However, she testified that she also stated at the meeting that she has "an appointment in January" when asked if she had "any moves toward VESID."[4]

After the mediation on December 17, 2004, and during the Christmas campus break, Plaintiff believed she was being harassed by her coworkers, which Plaintiff believed consisted of moving her mop bucket to the laundry room, putting dust on the floor in the suites, placing foot prints on the floor, putting papers on top of the soda machine, and moving her coat from one hook to another.  Plaintiff was not sure who did these acts.

On January 18, 2005, Plaintiff witnessed a coworker knock over her "wet floor" signs, which she did not report to her supervisor.  Near the end of her shift, Plaintiff found a piece of toilet paper on a carpet that she had already vacuumed.  Plaintiff believed that her coworker had placed it there.  In response, Plaintiff took toilet paper and put it on the floor of a bathroom that the coworker cleaned.  A short while later, Plaintiff returned to the bathroom to retrieve the toilet

---

[4]     The Court notes that, buried in the 141 pages of "medical records" that Plaintiff submitted in her opposition to Defendant's motion for summary judgment is documentation that reflects that Plaintiff underwent a series of neuropsychological evaluations beginning on November 22, 2004 (prior to Plaintiff's termination) and ending on March 2, 2005.  However, it is clear from the deposition testimony of Duncan Stark, Vice-President of the Employer who attended Plaintiff's mediation proceedings, as well as Robert Loftus, that at no point in time prior to Plaintiff's termination did Plaintiff make either the Union or the Employer aware that she was undergoing this testing.  Although Plaintiff denies this fact, Plaintiff's denial is both vague and ambiguous, since she does not offer any evidence that would support this denial–i.e., she does not indicate to whom she told that she was undergoing testing, when or where she told whomever she told, how she told whomever she told, or whom she was seeking evaluation from, and how she was seeking this evaluation.

16

paper before her coworker saw it.  However, she was unable to retrieve the toilet paper.  Plaintiff believed that her coworker may have already picked it up.  As a result, right after work, Plaintiff went to Shoppingtown Mall to call her supervisor (Gravina).  Plaintiff told Gravina that she put a piece of toilet paper on the coworker's floor in an attempt to mess up the coworker's work area.  Plaintiff asked Gravina to forgive her, and told Gravina that she knew it was wrong to have done what she did.  Gravina became quite upset and responded that what she had done was impermissible misconduct and said that he was going to write her up for it.  He said it was something that should never happen.  That same day, Plaintiff called Loftus and told him that she put paper on her coworker's bathroom floor.

Later that day, Plaintiff was discharged by the Employer for the stated reason of "intentionally messing up an area that her Employer is contracted to clean."  On or about January 19, 2005, Plaintiff received a termination notice from the Employer.  According to the Employer, Plaintiff's conduct amounted to insubordination, failure to follow procedures, and violation of Company policies.  The Employer stated that it "had no other course of action other than to terminate her after several attempts in mediation efforts have failed."[5]  The Employer's notice cited its progressive discipline of Plaintiff and the extra final notice she had received extending the progression for her.  Finally, the notice stated, "It is regrettable that no means were attempted by Christine to assist her in being able to do her job properly as she agreed to do in the mediation meetings."

---

[5]        The Court notes that, in addition to the incidents that Plaintiff was written up for, it is also apparent from the deposition testimony of Loftus and Stark that the Employer documented a number of incidents leading up to Plaintiff's termination that Plaintiff could have been written up for, but was not.

The Employer discharged Plaintiff pursuant to Article IX, Discipline and Discharge, in the CBA.  Plaintiff asserts that she was wrongfully discharged because the infractions that she was cited for do not amount to "for cause."  However, Plaintiff also testified that she knew "in her heart" that what she did on January 18, 2005, was "not right."

Plaintiff called Loftus again on January 21, 2005.  Loftus asked Plaintiff for her responses to her disciplines in writing.  Loftus also informed Plaintiff that he would grieve the termination. Plaintiff told Loftus in that conversation that she knew she was wrong.

Loftus grieved Plaintiff's termination and requested mediation pursuant to the procedures in the CBA.  On February 7, 2005, Loftus informed Plaintiff that she was scheduled for a mediation for her discharge on February 15, 2005.  Loftus, Stark, Gravina, and Plaintiff attended a mediation on February 15, 2005, with Mediator Tim Gorman, concerning Plaintiff's discharge. In addressing Plaintiff's probability of success in an arbitration concerning her discharge, Mediator Gorman told Plaintiff in the mediation to "'[t]ry to find a new life.'"

At the mediation, the Union questioned the Employer as to whether the Employer understood that what the Plaintiff meant by saying she messed up the bathroom was only a piece of toilet paper about the size of a dime.  The Employer responded that they still had to send someone up to the bathroom to check or clean it and that it was disruptive of their day.  The Employer also told Plaintiff during the mediation that there was a possibility she could come back to work with a doctor's statement.

After the hearing, Melanie Wlasuk who was the Union's general counsel and worked for the Union between 2002 and 2007, evaluated whether the Union should pursue arbitration regarding Plaintiff's termination.  Wlasuk made the decision not to arbitrate Plaintiff's discharge

18

based on five factors.

First, the Union did not know or have good reason to believe that Plaintiff was truly disabled or impaired to the extent that it interfered with her job performance.  Wlasuk considered that Plaintiff had worked at LeMoyne College as a cleaner for several years for Eagle's predecessors and for Eagle itself since 2000 and had been a Union member for that time period. Plaintiff did not have a history of problems on the job previously and had not demonstrated any significant inability to follow directions or Company policies previously.  In addition, Plaintiff failed to produce medical documentation of a disability or impairment that would interfere with her job performance.

Second, Wlasuk knew that the CBA between the Employer and the Union did not require progressive discipline, but only that any discipline be for just cause.  Wlasuk learned from Loftus that the Employer nonetheless followed and exhausted progressive discipline with Plaintiff and that Plaintiff had received three written warnings for infractions on July 21, 2004, August 26 and 30, 2004, and November 11, 2004, prior to her discharge.

Third, Wlasuk further learned that the Employer had given Plaintiff numerous extra chances above and beyond its progressive discipline policy.  She understood that the disciplinary notice for August 26 and 30, 2004 could have been split into two disciplines for two separate occurrences, but the Employer gave Plaintiff an additional chance by treating them as one occurrence.  Wlasuk further understood that the Employer agreed to hold off disciplining Plaintiff as part of an agreement with the Union and Plaintiff, giving Plaintiff additional time to obtain medical documentation of any disability.  Wlasuk also learned that the Employer gave Plaintiff an extra step of discipline and opportunity to improve by issuing Plaintiff an

19

additional written warning on November 15, 2004, in lieu of a suspension or termination.

Fourth, Wlasuk learned that the Union had grieved Plaintiff's disciplines and followed the contractual procedures to have multiple mediations with Plaintiff and the Employer through the New York State Mediation Board.  Wlasuk also found out that Plaintiff expressed that she had some confusion on the job and agreed to apply to VESID for assistance, and that, because the process required Plaintiff to provide medical documentation of a disability in order to qualify for VESID benefits, Plaintiff had agreed to see a medical professional and obtain the necessary documentation.  However, Wlasuk also learned that Plaintiff never provided the Union or the Employer with the necessary documentation.

Finally, Wlasuk was apprised of the details surrounding the January 18, 2005 incident, and the fact that the Union grieved Plaintiff's discharge and pursued mediation to explore whether the Employer would change its decision and to determine whether Plaintiff had yet obtained any medical documentation of her alleged condition or had taken any steps to be evaluated by a competent professional that the Union could use to defend her.  Wlasuk considered Plaintiff's act of messing up a coworker's workplace an intentional act that amounted to misconduct.  Wlasuk believed that Plaintiff's conduct on January 18, 2005, was not related to any alleged disability or confusion.  Wlasuk also believed that if the Union arbitrated the discharge, it would undermine the settlement that came out of the mediations prior to the Plaintiff's discharge because Plaintiff had not produced the medical documentation that she had agreed to produce.  In addition, Wlasuk believed that taking the discharge to arbitration would weaken the Union's ability to settle matters in the future with the Employer.

In sum, Wlasuk believed that the Employer disciplined and discharged Plaintiff with just

cause and an arbitration would not be successful.  Therefore, Wlasuk determined that the Union should not devote additional resources by taking Plaintiff's discharge to arbitration.

## III.    ANALYSIS

Generally, Plaintiff asserts four claims in this action: (1) two claims under Section 301 of the Labor Management Relations Act; (2) one claim under the Americans with Disabilities Act; and (3) one claim under the N.Y. State Human Rights Law.

### A.    Plaintiff's Two Claims Under Section 301 of LMRA

Plaintiff asserts two claims under Section 301 of the Labor Management Relations Act ("LMRA"), which under the circumstances are known as "hybrid" claims: (1) a breach of the duty of fair representation; and (2) a breach of the parties' CBA.[6]  "The suit against the employer rests on [S]ection 301, since the employee is alleging a breach of the collective bargaining agreement." *DelCostello*, 462 U.S. at 164.  "The suit against the union is one for breach of the union's duty of fair representation, which is implied under the scheme of the National Labor Relations Act."  *Id*.  "Yet the two claims are inextricably interdependent."  *Id*. (citation omitted).  "To prevail against either the company or the Union, employee-plaintiffs must not only show that their discharge was contrary to the contract but must also carry the burden of demonstrating a breach of duty by the Union."  *Id*. at 165 (citations and internal quotations omitted).  Stated another way, to be successful against either the Employer or the Union, an employee-plaintiff must establish breach of the Union's duty of fair representation.  *See Beckman v. U.S. Postal*

---

[6]      A claim by a union employee against an employer based on breach of a collective bargaining agreement, and the Union for breaching its duty of fair representation, is considered a "hybrid" Section 301 claim under the Labor Management Relations Act.  *See DelCostello v. Int'l Brotherhood of Teamsters*, 462 U.S. 151, 163-64 (1983).

*Service*, 79 F. Supp.2d 394, 405 (S.D.N.Y. 2000) (citations omitted).

### 1.    Duty of Fair Representation

With regard to Plaintiff's fair-representation claim, Defendant Union argues that it did not breach its duty of fair representation in handling Plaintiff's grievances, and in not arbitrating her termination.  In addition, the Union argues that its actions in processing Plaintiff's grievances were not motivated by discriminatory animus, and that Plaintiff is unable to demonstrate that the Union either colluded with Management to discriminate against Plaintiff or caused the Employer to discriminate against Plaintiff.  As a result, the Union argues that Plaintiff's Section 301 claim must fail as a matter of law.

In response, Plaintiff argues that the Union breached its duty of fair representation by (1) failing to use Plaintiff's disability as a defense at the final mediation hearing; (2) failing to arbitrate Plaintiff's termination; and (3) failing to prevent harassment and request reasonable accommodations.  Plaintiff further argues that these actions, or omissions, are arbitrary, discriminatory, and amount to bad faith.

In reply, Defendant Union argues that Plaintiff failed to submit admissible evidence that the Union breached its duty of fair representation.

As an initial matter, the Court notes that, even assuming that there was not cause to fire Plaintiff, or even assuming that the Employer (due to a failure to indicate a time frame) breached the agreement with Plaintiff not to discipline her until she was given time to produce certain medical documentation evidencing a disability, the relevant issue before the Court is whether the Union breached its duty of fair representation.

"A union has broad discretion in its decision whether and how to pursue an employee's grievance against an employer." *Beckman v. U.S. Postal Service*, 79 F. Supp.2d 394, 401 (S.D.N.Y. 2000) (citing *Chauffeurs Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 567-68 [1990]) (other citations omitted).  Although this discretion is not unlimited, *see Vaca v. Sipes*, 386 U.S. 171, 184-86 (1967), it remains broad because "union discretion is essential to the proper functioning of the collective-bargaining system." *International Bhd. of Elec. Workers v. Foust*, 442 U.S. 42, 51 (1979) (noting also that "Union supervision of employee complaints promotes settlements, avoids processing of frivolous claims, and strengthens the employer's confidence in the union," all of which is imperative to avoiding "the costs of private dispute resolution").

"Based on this rationale, the duty of fair representation merely obliges a union to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Beckman*, 79 F. Supp.2d at 401 (citing *Regan v. Soft Drink & Brewery Workers Union, Local 812*, No. 95-7420, 1995 WL 722862, at *1 [2d Cir. Nov. 14, 1995]) (other citations omitted).  "It is the plaintiff's burden to prove the union breached its duty, not the employer's to show that it did not." *Id*. (citation and internal quotations omitted).  Consequently, to prevail on a claim of breach of the duty of fair representation, the plaintiff must establish two elements: (1) the Union's conduct was "arbitrary, discriminatory, or in bad faith"; and (2) "the Union's acts or omissions seriously undermined the arbitral process." *Id*. (citations omitted).

"A union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness

23

as to be irrational." *Sanozky v. Int'l Ass'n of Machinists and Aerospace Workers*, 415 F.3d 279,

282-83 (2d Cir. 2005) (citing *Airline Pilots Ass'n Int'l v. O'Neill*, 499 U.S. 65, 67 [1991]).  In

addition, "the Second Circuit has held that the second element requires a plaintiff to prove that

there was a causal connection between the union's wrongful conduct and [her] injuries." *Vargas

v. Hill*, 152 F. Supp.2d 315, 320 n.6 (S.D.N.Y. 2001) (citation and internal quotations omitted).

Moreover, "[n]egligence or 'tactical errors' on the part of the union are insufficient to establish a

breach of the duty of fair representation.  *White v. White Rose Food, a Div. of DiGiorgio Corp*.,

62 F. Supp.2d 878, 884 (E.D.N.Y. 1999) (citation omitted).

Here, having carefully considered the undisputed material facts of this action, as well as

the parties' argument, the Court concludes that the allegations contained in Plaintiff's Amended

Complaint and her papers opposing Defendant's motion for summary judgment do not raise

triable issues of fact as to whether the Union breached its duty of fair representation.  The Court

will address each of Plaintiff's three particular fair-representation claims in turn.

### a.    Discriminatory Intent and the Union's Failure to Inform the Employer About Plaintiff's Efforts to Obtain a "Neuropsyche" Evaluation

First, Plaintiff claims that the Union's failure to inform the Employer that Plaintiff was

seeking a "neuropsyche" evaluation constitutes a breach of the duty of fair representation.

Plaintiff further claims that the Union improperly handled Plaintiff's grievances because of its

discriminatory animus toward Plaintiff.

As an initial matter, Plaintiff does not indicate when the Union became aware that

Plaintiff was seeking a "neuropsyche" evaluation, or when the Union should have made the

Employer aware of this fact.  However, these obstacles aside, the Court notes that the Employer

was informed of Plaintiff's efforts to obtain an evaluation during the September 2004 mediation

proceedings, when Plaintiff, the Union and the Employer agreed that Plaintiff would get some

type of medical notification to the Employer concerning her medical condition in exchange for

the Employer's promise to hold off disciplining Plaintiff for any other disciplinary matters.

Moreover, during the December 2004 mediation, the Employer, Union and Plaintiff once again

agreed that Plaintiff would obtain medical documentation concerning any condition for

Vocational and Educational Services for Individuals with Disabilities (or "VESID") so that a job

coach could be assigned, and the Employer again agreed to hold off disciplining Plaintiff.

Certainly, the Union does not have a duty to string an Employer along while an employee

delays seeking evaluation that the Employer has requested and the employee has agreed to

provide.  In addition, and more importantly, Plaintiff was not terminated as a result of the

December mediation.  Instead, the Union was able to convince the Employer to give Plaintiff

additional time to obtain the requested documentation.  In fact, Plaintiff would not have been

terminated but for the incident on January 18, 2005.

After the December mediation, Plaintiff was well aware that she had run out of chances.

However, Plaintiff chose to delay visiting a doctor for a period of months from the time the

Union first encouraged her to do so in April 2004.  Furthermore, Plaintiff committed the January

18, 2005, infraction, after being put on notice that her behavior would be scrutinized.  Regardless

of the minimal nature of the final infraction, the Union had done all it could up until January 18,

2005, to see to it that Plaintiff remain employed.[7]

---

[7]     Again, the Court notes that, although Plaintiff began undergoing testing in
November 2004, the Union was never made aware of this fact until long after Plaintiff was
terminated.

In addition, the Court notes that it has found no admissible record evidence from which a rational fact-finder could conclude that the Union handled Plaintiff's grievances with any discriminatory intent.  To establish discriminatory animus, Plaintiff must–at a minimum–have evidence of different treatment from similarly situated employees and that the disparate treatment is based on disability.  *See, e.g.*, *Nweke v. Prudential Ins. Co. of America*, 25 F. Supp.2d 203, 223-24 (S.D.N.Y. 1998).  Here, Plaintiff has provided no such evidence.

In sum, the Court finds that it was no secret that the Employer was aware that Plaintiff was seeking the medical documentation that the Employer was requesting, as evidenced by Plaintiff's agreements during multiple mediation proceedings to obtain such documentation. Moreover, to the extent that Plaintiff was having complications seeing the appropriate physician or was awaiting the result of her neuropsychological evaluation, there is no record evidence that the Union was aware of this fact.  In addition, Plaintiff was asked during the December 2004 mediation by the Employer if she had "any moves toward VESID," to which she vaguely responded that she has "an appointment in January."  Finally, there is no evidence of any discriminatory intent regarding how the Union handled Plaintiff's grievances.

For all of these reasons, the Court concludes that the Union did not breach its duty of fair representation by failing to apprise the Employer of the fact that Plaintiff was in the process of obtaining a "neuropsyche" evaluation.

**b.     Failure to Arbitrate Plaintiff's Termination**

Second, Plaintiff claims that the Union's failure to arbitrate her termination amounts to a breach of the Union's duty of fair representation.

26

As an initial matter, the Court notes that, each time that Plaintiff was disciplined, the Union grieved on her behalf.  In addition, Loftus frequently spoke with Plaintiff, made independent efforts to contact VESID on her behalf, attended her VESID appointment with her, met with the Employer outside of the mediation forum and convinced the Employer to issue written instructions to Plaintiff regarding her job responsibilities, helped convince the Employer to apply progressive discipline with Plaintiff and not terminate her after her third infraction within six months, and grieved Plaintiff's termination.  Moreover, Loftus had encouraged Plaintiff to visit with a physician and obtain the necessary disability documentation from at least early April of 2004, after Plaintiff's VESID appointment.  Nonetheless, Plaintiff claims that the Union breached its duty of fair representation, because the Union did not arbitrate Plaintiff's termination.

"It is well established that while a union may not arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion, an employee does not have an absolute right to have his or her grievance taken to arbitration."  *White v. White Rose Food, a Div. of DiGiorgio Corp.*, 62 F. Supp.2d 878, 884 (E.D.N.Y. 1999); *see also Nweke*, 25 F. Supp.2d at 221 (S.D.N.Y. 1998).  "[A]s long as the union acts in good faith, the courts cannot intercede on behalf of employees who may be prejudiced by rationally founded decisions which operate to their particular disadvantage."  *White*, 62 F. Supp.2d at 884.

Melanie Wlasuk, the Union's General Counsel in 2005, evaluated whether the Union should pursue arbitration regarding Plaintiff's termination.  Wlasuk made the decision not to arbitrate Plaintiff's discharge based on several factors.  Among these factors were the following: (1) the fact that the Union did not know or have good reason to believe that Plaintiff was truly

disabled or impaired to the extent that it interfered with her job performance; (2) the fact that Wlasuk knew that the CBA between the Employer and the Union did not require progressive discipline, but the Employer nonetheless followed and exhausted progressive discipline with Plaintiff; (3) the fact that Plaintiff received three written warnings for infractions on July 21, 2004, August 26 and 30, 2004, and November 11, 2004, prior to the January 18, 2005, incident; (4) the fact that the Employer gave Plaintiff numerous extra chances above and beyond its progressive discipline policy; (5) the fact that the Employer gave Plaintiff an extra step of discipline and an opportunity to improve by issuing Plaintiff an additional written warning on November 15, 2004, in lieu of a suspension or termination; (6) the fact that the Union had grieved Plaintiff's disciplines and followed the contractual procedures to have multiple mediations with Plaintiff and the Employer through the New York State Mediation Board; (7) the fact that Plaintiff had never provided the Union or the Employer with the requested medical documentation despite her agreement to do so since September 1, 2004; and (8) the fact that Wlasuk believed that taking the discharge to arbitration would weaken the Union's ability to settle matters in the future with the Employer.

After carefully considering all of these factors, the Court concludes that it cannot be said that the Union's decision not to arbitrate Plaintiff's termination was arbitrary.  Therefore, the Court concludes that the Union did not breach its duty of fair representation for choosing not to arbitrate Plaintiff's termination.

### c.    Failure to Prevent Harassment and Request Reasonable Accommodations

Third, Plaintiff claims that the Union's failure to prevent Plaintiff from suffering harassment as well as the Union's failure to request reasonable accommodations for Plaintiff amounts to a breach of the duty of fair representation.

As an initial matter, the Court notes that there is no record evidence beyond vague, conclusory allegations, that the Union in any way improperly handled Plaintiff's grievances.  To the contrary, the Union helped Plaintiff obtain additional time to procure medical documentation, and convinced the Employer not to terminate Plaintiff after she received her third written infraction.  Moreover, the Union convinced the Employer to allow Plaintiff to work with VESID and an assigned job coach.  In addition, Loftus set up and attended Plaintiff's VESID appointment with Plaintiff.  In sum, the Court finds that whatever reasonable accommodations the Union allegedly failed to request are either immaterial or non-existent.

Regarding the harassment, Plaintiff complained to Loftus about how her supervisors spoke to her, and insisted after her December 2004 mediation hearing that co-workers played pranks on her, which included moving her coat from one hook to another and knocking over a "wet floor" sign that she had set up.  "The employer, not the union that represents employees, has a duty to maintain a workplace that is free of pervasive hostility based on impermissible factors."  *Yarde v. Good Samaritan Hosp*., 360 F. Supp.2d 552, 566 (S.D.N.Y. 2005).  "All a Union can do is file a grievance when a member complains of hostile work environment."  *Yarde*, 360 F. Supp.2d at 566.  Here, the Court can find no admissible record evidence that Plaintiff ever sought to have the Union grieve any of the "harassment" incidents that occurred prior to her termination.       In addition, "[i]solated incidents typically do not rise to the level of a hostile work environment unless they are 'of sufficient severity' to 'alter the terms and conditions of employment as to create such an environment.'"  *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006) (citation omitted).  "Generally, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive."  *Zegarelli*, 451 F.3d at 149 (citation and internal quotations omitted).  In determining whether a Plaintiff is

able to make out a hostile work environment claim, a court must consider certain factors,
including "the frequency of the discriminatory conduct; its severity; whether it is physically
threatening or humiliating, or a mere offensive utterance; whether it unreasonably interferes with
an employee's work performance; [and] . . . the extent to which the conduct occurred because of
Plaintiffs' [membership in a protected class]."  *Id*. at 149-50 (citations and internal quotations
omitted).

 Here, Plaintiff has not identified the protected class of which she is allegedly a member.
Moreover, to the extent that Plaintiff is a member of a protected class, she has not offered any
evidence that the conduct occurred as a result of Plaintiff's membership in the protected class.
Finally, the "harassment" that Plaintiff complains of was certainly not severe, did not occur with
any great frequency, and was not physically threatening.  In sum, even if Plaintiff made the
Union aware of all of the harassment incidents, and even if Plaintiff asked the Union to grieve
these incidents, it cannot be said that the Union's failure to do so amounts to a breach of its duty
of fair representation.  <u>As a result, the Court concludes that the Union did not breach its duty of
fair representation by not preventing or grieving the harassment that Plaintiff complained about.</u>

### 2. Breach of Collective Bargaining Agreement

 Turning to Plaintiff's claim that the Employer breached its CBA, it should be noted that,
as a Union employee, the Union was Plaintiff's exclusive bargaining agent.  *See* N.Y. Lab. Law
§ 705 (McKinney's 2002); *see also Wilson v. Hacker*, 101 N.Y.S.2d 461, 467 (N.Y. Sup. Ct.
1950).  When "the Union was plaintiff's exclusive bargaining agent, plaintiff must prove that the
Union breached its duty of fair representation before the Court can even consider its allegations
against the [employer]."  *Beckman v. U.S. Postal Service*, 79 F. Supp.2d 394, 405 (S.D.N.Y.
2000).  "Thus, plaintiff's case against the [employer] cannot succeed, as a matter of law, in the

absence of an essential element of their claim, namely, that the Union breached its duty of fair representation." *Beckman*, 79 F. Supp.2d at 405.  As a result, Defendant Union's motion for summary judgment on this ground is granted, and Plaintiff's claim that the Union breached the CBA is dismissed.

### B.      Plaintiff's Claim Under the ADA

With regard to Plaintiff's claim that the Union is liable to Plaintiff under the Americans with Disabilities Act ("ADA") for Plaintiff's termination, the Union argues that it is not liable to Plaintiff under a theory of disability discrimination for two reasons.  First, the Union argues that it cannot be liable under the ADA, because it did not breach its duty of fair representation.  Second, the Union argues that Plaintiff cannot make out a prima facie case of discrimination under the ADA.

In response, Plaintiff argues that the Union is liable under the ADA because it violated its duty by not informing Plaintiff of her rights, of the consequences of not obtaining a "neuropsyche" exam, and by not presenting Plaintiff's version of the events at mediation.

In reply, Defendant Union argues that because Plaintiff has not submitted any admissible evidence that the Union breached its duty of fair representation, its ADA claim must fail.

Having carefully considered the undisputed material facts of this action, as well as the parties' arguments, for the same reasons previously indicated, the Court concludes that the allegations contained in Plaintiff's Amended Complaint and her papers opposing the summary judgment motion do not raise triable issues of fact as to whether the Union breached its duty.  A finding that a union breached its duty of fair representation is essential to the existence of an ADA claim.  *See Ross v. CWA Local 1110*, 91-CV-6367, 1995 U.S. Dist. LEXIS 7959, at *18-19 (S.D.N.Y. June 9, 1995), *aff'd*, 100 F.3d 944 (2d Cir. 1996); *see also Nweke*, 25 F. Supp.2d at

220 (S.D.N.Y. 1998).  As a result, the Court concludes that Plaintiff is unable to make out a

claim under the ADA.  <u>For this reason, the Union's motion for summary judgment regarding</u>

<u>Plaintiff's ADA claim is granted</u>.

In the alternative, the Court finds that Plaintiff is unable to succeed on the merits of her

ADA claim against the Union.

In disability discrimination cases, courts apply the three-step burden-shifting analysis

established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  First, the

plaintiff must establish a prima facie case.  *McDonnell Douglas Corp.*, 411 U.S. at 802-04.  If

the plaintiff establishes a prima facie case, the burden of production shifts to the defendant to

demonstrate a legitimate non-discriminatory reason for its actions.  *Id.*  Once the defendant

offers a legitimate non-discriminatory reason, in order to prevail, the plaintiff must show that the

proffered reason is nothing but a pretext for intentional discrimination.  *Id.*  Despite the fact that

the burden of production may shift, at all times the plaintiff maintains the burden of persuasion,

and therefore, in order to withstand summary judgment, the plaintiff "must establish a genuine

issue of material fact either through direct, statistical or circumstantial evidence as to whether the

employer's reason for discharging her is false and as to whether it is more likely that a

discriminatory reason motivated the employer to make the adverse employment decision." *Gallo*

*v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1225 (2d Cir.1994).

"A plaintiff alleging employment discrimination under the ADA bears the initial burden

of establishing a prima facie case."  *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 869 (2d

Cir.1998) (citing *Wernick v. Fed. Reserve Bank of N.Y.*, 91 F.3d 379, 383 [2d Cir.1996]).  "To

satisfy this burden, plaintiff must establish that (1) her employer is subject to the ADA; (2) she is

disabled within the meaning of the ADA; (3) she was otherwise qualified to perform the essential

functions of her job, with or without reasonable accommodation; and (4) she suffered an adverse employment action because of her disability." *Cody v. County of Nassau*, 577 F. Supp.2d 623, 637 (E.D.N.Y. 2008) (citing *Ryan,* 135 F.3d at 869-70) (other citations omitted).  "The burden that such a plaintiff must meet in order to defeat summary judgment at the prima facie stage is not onerous, and has been described as de minimus."  *Cody*, 577 F. Supp.2d at 637 (internal quotations and other citations omitted).

Assuming that the Employer is subject to the ADA, the second prong of a prima facie case of disability discrimination examines whether Plaintiff is disabled within the meaning of the ADA.  Under the ADA, "disability" is defined as follows: (A) a physical or mental impairment that substantially limits one or more major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment.  42 U.S.C. § 12102(2).

Therefore, "[a] person can demonstrate that she has a disability within the meaning of the ADA in any of three ways."  *Ragusa v. Malverne Union Free Sch. Dist.*, 582 F. Supp.2d 326, 340 (E.D.N.Y. 2008).  "She can show that she (1) has a physical or mental impairment that 'substantially limits' one or more 'major life activities'; (2) has a 'record of such impairment'; or (3) is 'regarded as' having such an impairment."  *Ragusa*, 582 F. Supp.2d at 340 (citing 42 U.S.C. § 12102[2]).  "Disability determinations are made on a case by case basis."  *Id.* (citing *Reeves v. Johnson Controls World Servs. Inc*., 140 F.3d 144, 151-52 [2d Cir. 1998]).

Regarding the first way in which a person can demonstrate that she has a disability, "[c]ourts apply a three-part test to determine whether a plaintiff has an actual disability under the ADA."  *Cody*, 577 F. Supp.2d at 637 (citations omitted).  "First, plaintiff must demonstrate that she suffers from a physical or mental impairment."  *Id.* at 638 (citations omitted).  "Second, plaintiff must identify the activity claimed to be impaired and establish that it constitutes a major

33

life activity."  *Id.* (citations and internal quotations omitted).  "Third, plaintiff must demonstrate

that her impairment substantially limits the major life activity identified in step two."  *Id.*

(citations and internal quotations omitted).

### 1. Physical or Mental Impairment

Although the ADA does not define the term "impairment," the Equal Employment

Opportunity Commission ("EEOC") has issued administrative regulations implementing the

ADA, which define a "physical or mental impairment" as follows:

> (1) Any physiological disorder, or condition . . . affecting one or more
> of the following body systems: neurological, musculoskeletal, special
> sense organs, respiratory (including speech organs), cardiovascular,
> reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and
> endocrine; or
>
> (2) Any mental or psychological disorder, such as mental retardation,
> organic brain syndrome, emotional or mental illness, and specific
> learning disabilities.

*Cody*, 577 F. Supp.2d at 638 (citing 29 C.F.R. § 1630.2[h]).

"Under the law of this Circuit, the EEOC's regulations are entitled to 'great deference' in

interpreting the ADA."  *Id.* (citing *Muller v. Costello*, 187 F.3d 298, 312 [2d Cir. 1999]) (other

citations omitted).

### 2. Major Life Activities

The fact that a person may suffer from an impairment does not make that person disabled

for purposes of the ADA.  *Id.* (citations omitted).  In order for a person to be considered

"disabled" for purposes of the ADA, that person must "demonstrate that the impairment limits a

major life activity."  *Id.* (citations omitted).

"Major life activities are generally those activities that are of central importance to daily

life."  *Id.* (citations and internal quotations omitted).  "Such activities include functions such as

caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  *Id*. at 639 (citations and internal quotations omitted).  "The Second Circuit has also identified other 'major life activities,' including, but not limited to, 'sitting, standing, lifting or reaching.'"  *Id*. (citing *Ryan*, 135 F.3d at 870).

### 3.        Substantial Limitation

"To constitute a disability, an impairment must not merely affect a major life activity, it must substantially limit that activity."  *Id*. (citations omitted).  "Thus a plaintiff who showed that she had an impairment and that the impairment affected a major life activity would nonetheless be ineligible to prevail under the ADA if the limitation of the major life activity was not substantial."  *Id*. (citations and internal quotations omitted).

"The EEOC regulations provide that an impairment, whether physical or mental, "substantially limits" a major life activity where an individual is:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or
>
> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

*Id*. (citing 29 C.F.R. § 1630.2(j)[1]).

"In other words, the ADA protects only a limited class of persons-individuals who suffer from impairments significantly more severe than those encountered by ordinary people in everyday life."  *Id*. (citations omitted).  "The word 'substantial' . . .  precludes impairments that interfere in only a minor way with the performance of a major life activity from qualifying as disabilities."  *Id*. (citation omitted).  Accordingly, "to be substantially limited in performing a major life activity, an individual must have an impairment that prevents or severely restricts the

individual from doing activities that are of central importance to most people's daily lives." *Id*. (citation omitted).  "Moreover, the impairment's impact must also be permanent or long-term." *Id*. (citation omitted).

"To prove that she suffers from a disability that substantially limits a major life activity, a plaintiff is required to do more than merely submit evidence of a medical diagnosis of an impairment." *Id*. at 639-40 (citations omitted).  "Rather, the ADA requires those claiming the Act's protection to prove a disability by offering evidence that the extent of the limitation caused by the impairment in terms of their own experience is substantial." *Id*. at 640 (citations omitted). "As a result, a plaintiff cannot prevail on an ADA disability discrimination claim where she merely submits evidence that she suffers from an impairment." *Id*. (citation omitted).

The record evidence indicates that there is at least a question of fact as to whether Plaintiff suffers from a mental impairment.  Plaintiff has identified this impairment as a mental and emotional illness stemming from a childhood injury.  In addition, Plaintiff has arguably demonstrated (albeit after her termination) that this impairment limits a major life activity (her ability to work as a janitor).  However, Plaintiff has offered no record evidence that the impairment substantially limits her ability to work.  To the contrary, given that Plaintiff performed janitorial services without incident for roughly fifteen years (1988 to 2003), the record evidence reflects that Plaintiff's impairment hardly limits her ability to work.  Moreover, the incident that resulted in Plaintiff's termination had nothing at all to do with her alleged impairment.  As a result, the Court concludes that a rational factfinder could not find that Plaintiff has an actual disability under the ADA's first test.

### 4.       Record of Having an Impairment

"Plaintiff may qualify as disabled for purposes of the ADA without a showing of a substantial limitation of a major life activity where she can provide 'a record' of an impairment that substantially limits one or more major life activities." *Id.* (citing 42 U.S.C. § 12102(2)[B]). According to the EEOC regulations:

> This part of the definition is satisfied if a record relied on by an employer indicates that the individual has or has had a substantially limiting impairment. The impairment indicated in the record must be an impairment that would substantially limit one or more of the individual's major life activities.

29 C.F.R. § 1630.2(k).

"Records that could potentially contain this information include education, medical or employment records." *Covello v. Depository Trust Co.*, 212 F. Supp.2d 109, 121 (E.D.N.Y.2002) (citing 29 C.F.R. § 1630). "The record must be one that shows an impairment that satisfies the ADA; a record reflecting a plaintiff's classification as disabled for other purposes or under other standards is not enough." *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 645 (2d Cir.1998) (citing 29 C.F.R. § 1630.2[k]).

The only evidence of a record of a disability that Plaintiff has provided is an examination that Plaintiff underwent in 1983.  As an initial matter, this examination does not clearly establish that Plaintiff suffers from the impairments that she currently alleges.  Moreover, and more importantly, there is no indication that the Employer or the Union were provided with this record at any point throughout Plaintiff's employment with Eagle.  As a result, it would have been impossible for the Employer to rely on this record to conclude that Plaintiff suffers from a disability that substantially limits her ability to work.  Therefore, the Court concludes that a rational factfinder could not find that Plaintiff has an actual disability under the ADA's second test.

### 5.    Regarded as Having an Impairment

"The third way to prove a 'disability' within the meaning of the ADA is to prove that the plaintiff is 'regarded as' having an impairment that substantially limits one or more major life activities." *Colwell*, 158 F.3d at 646 (quoting 42 U.S.C. § 12102(2)[C]).  Whether an individual is 'regarded as' having a disability "depends not on the existence of an actual disability but on 'the employer's perception of the employee' and is a question of 'intent.'" *Ragusa*, 582 F. Supp.2d at 344 (citing *Capobianco v. City of N.Y.*, 422 F.3d 47, 57 [2d Cir. 2005]).  "It is not enough that the employer perceive the employee as somehow disabled; the employer must regard the employee as disabled within the meaning of the ADA, i.e., having an impairment that substantially limits a major life activity." *Ragusa*, 582 F. Supp.2d at 344 (citing *Capobianco*, 422 F.3d at 57) (other citations omitted).  In addition, a general assertion, such as "there is significant evidence to show a fact finder that Defendants perceived Plaintiff as a disabled person and knew of Plaintiff's problems," without evidence to support the assertion, is not enough to defeat summary judgment.  *Id*.  In sum, "even assuming Defendants [are] aware of Plaintiff's ailments," Plaintiff must present evidence "to suggest that [Defendants] viewed her as disabled within the meaning of the ADA, that is, as possessing a medical condition that substantially limited her ability to work." *Id*.

Here, there is no evidence that the employer regarded Plaintiff as disabled within the meaning of the ADA–i.e., regarded Plaintiff as having an impairment that substantially limited her ability to work.  Certainly, Plaintiff's supervisors may have been aware that Plaintiff suffered from certain ailments.  However, it is not enough that the employer perceive the employee as disabled.

Regardless of how the Employer perceived Plaintiff, given that Plaintiff's supervisors criticized her work on a number of occasions, and wrote her up for her failure to comply with certain rules and/or policies, the record evidence suggests that the Employer in fact thought that Plaintiff was perfectly capable of performing her work, as she had for approximately fifteen years without incident.  In addition, the fact that the Employer was willing to allow Plaintiff to have the assistance of a job coach does not diminish this conclusion.  This is because the job coach was conditioned on Plaintiff obtaining documentation of a disability, which evidences the fact that the Employer was not fully convinced that Plaintiff suffered from a disability within the meaning of the ADA.  As a result, the Court concludes that a rational factfinder could not find that Plaintiff has an actual disability under the ADA's third test.

### 6.      Conclusion Regarding Plaintiff's ADA Claim

Based on the analysis above, the Court concludes that Plaintiff is unable to succeed on the merits of her ADA claim.  Specifically, Plaintiff is unable to satisfy her initial burden of demonstrating a prima facie case of discrimination because she has not provided sufficient evidence that she is disabled within the meaning of the ADA.  In addition, Plaintiff failed to provide sufficient evidence that she was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation.  Finally, Plaintiff is unable to make out a prima facie case because she has not provided sufficient evidence that she suffered an adverse employment action because of her disability.

### C.      Plaintiff's Claim Under the N.Y. State Human Rights Law

With regard to Plaintiff's claim that the Union violated the New York State Human Rights Law ("NYSHRL"), the Union argues that Plaintiff has not made out a claim for violation

of the NYSHRL because the Union has not breached its duty of fair representation.  In addition,

the Union argues that Plaintiff has not made out a prima facie case of discrimination as required

under the NYSHRL because Plaintiff has not demonstrated that she had an impairment that was

known to the Union prior to her termination date.  Finally, the Union argues that it did not have

an affirmative duty to ask for reasonable accommodations for Plaintiff, and, Plaintiff herself did

not request any, which further absolves the Union of liability under the NYSHRL.

In response, Plaintiff does not squarely address her NYSHRL claim, but rather broadly

indicates that she is disabled and has suffered discrimination for the reasons previously

mentioned in this decision.

The NYSHRL's definition of "disability" is somewhat broader than the ADA definition.

*See Nugent v. The St.Luke's/Roosevelt Hosp. of New York*, 05-CV-5109, 2007 WL 1149979, at

*18 (S.D.N.Y. Apr. 18, 2007).  Under the NYSHRL, a disability is "a physical, mental, or

medical impairment resulting from anatomical, physiological, genetic or neurological conditions

which prevents the exercise of a normal bodily function or is demonstrable by medically

accepted clinical or laboratory diagnostic techniques."  *Nugent*, 2007 WL 1149979, at *18

(quoting N.Y. Exec. Law § 296[21] [McKinney's 2007]).  The definition is limited to disabilities

which, upon granting of reasonable accommodations, do not prevent the individual from

performing her job in a reasonable manner.  N.Y. Exec. Law. § 296(21) (McKinney's 2007).

However, "[c]ourts in the Second Circuit apply the same analysis to claims under [the NYSHRL]

and Title VII."  *Bryant v. Verizon Commc'ns, Inc*., 550 F. Supp.2d 513, 528 (S.D.N.Y. 2008)

(citations omitted).  Therefore, for the same reasons that the Court finds that Plaintiff is unable to

make out an ADA claim, the Court finds that Plaintiff is unable to make out a claim under the

NYSHRL.  <u>As a result, Defendant Union's motion for summary judgment regarding Plaintiff's Human Rights Law claim is granted</u>.

**ACCORDINGLY**, it is

**ORDERED** that Defendant Union's motion to strike (Dkt. No. 96) is **<u>GRANTED</u> in part**, **and <u>DENIED</u> in part**, as described above in Part II.A. of this Decision and Order; and it is further

**ORDERED** that Defendant Union's motion for summary judgment (Dkt. No. 87) is **<u>GRANTED</u>** in its entirety; and it is further

**ORDERED** that Plaintiff's claims against Defendant Union are dismissed in their entirety; and it is further

**ORDERED** that Defendant Eagle is granted leave to file a motion for summary judgment on or before September 4, 2009.

Dated: June 4, 2009
　　　　Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge

41